UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES MICHAEL HURLBURT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cv-30173-KAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER
(Dkt. Nos. 13 & 17)
March 30, 2017

ROBERTSON, U.S.M.J.

I.      Introduction

On September 29, 2015, plaintiff James Michael Hurlburt ("Plaintiff") filed a complaint

pursuant to 42 U.S.C. § 405(g) against the Acting Commissioner of the Social Security

Administration ("Commissioner"), appealing the denial of his claims for Supplemental Security

Income ("SSI") and Social Security Disability Insurance ("SSDI").  Plaintiff asserts that the

Commissioner's decision denying him such benefits – memorialized in a July 24, 2014 decision

by an administrative law judge ("ALJ") – is in error.  Specifically, Plaintiff alleges that the ALJ

erred by not finding that his mental impairments of depression and anxiety were severe.  Plaintiff

has moved for judgment on the pleadings requesting that the Commissioner's decision be

reversed, or, in the alternative, remanded for further proceedings (Dkt. No. 13).  The

Commissioner has moved for an order affirming the decision of the Commissioner (Dkt. No. 17).

The parties have consented to this court's jurisdiction (Dkt. No. 12).  *See* 28 U.S.C. § 636(c);

Fed. R. Civ. P. 73.  For the following reasons, the court will deny Plaintiff's motion and allow

the Commissioner's motion.

II.     Procedural Background

Plaintiff applied for SSI and SSDI on October 3, 2011, alleging a June 6, 2007 onset of

disability due to a left shoulder injury and emphysema (Administrative Record ("A.R.") at 191-

207, 215-224).  Plaintiff's applications were denied initially and on reconsideration (*id*. at 119-

24, 129-35).  Plaintiff requested a hearing before an ALJ, and one was held on April 11, 2014, at

which time Plaintiff claimed disability due to a left shoulder injury, diabetes, emphysema,

depression, and anxiety (*id*. at 30-65).  Following the hearing, the ALJ issued a decision on July

24, 2014, finding that Plaintiff was not disabled and denying Plaintiff's claims (*id*. at 10-27).

The Appeals Council denied review on July 29, 2015, and the ALJ's decision became the final

decision of the Commissioner (*id*. at 1-7).  This appeal followed.

III.    Legal Standards

A.    Standard for Entitlement to Social Security Disability Insurance

In order to qualify for SSI and SSDI, a claimant must demonstrate that he is disabled

within the meaning of the Social Security Act.[1]   A claimant is disabled for purposes of SSI and

SSDI if he "is unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve months."  42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is unable to engage in any substantial

---

[1] For SSDI, the claimant also must demonstrate that the disability commenced prior to the
expiration of his insured status for disability insurance benefits.  *See* 42 U.S.C. § 423(a)(1).

gainful activity when he "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under each statute.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*.  *See also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. §§ 404.1520, 416.920.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id*.  "RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-

related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, *Goodermote*, 690 F.2d at 7, including the burden to demonstrate RFC. *Flaherty v. Astrue*, No. 11-11156-TSH, 2013 WL 4784419, at *9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d 7.

### B. Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir. Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)). In applying

the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Irlanda Ortiz*, 955 F.2d at 769. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

IV.   Facts

A.   Background

Plaintiff was 53 years old at the time of the ALJ's decision (A.R. at 21, 191, 198). He has a high school education and previously worked as an electrician and sheet metal mechanic (*id*. at 219-220). Plaintiff was working as an electrician in February 2007, when he injured his left shoulder on the job (*id*. at 37-38). He continued to work in a light duty capacity for four months after sustaining the injury, until approximately June 2007, when he had his first shoulder surgery (*id*. at 38, 55).

B.   Medical Evidence[2]

1.   References to Mental Health in Physician Notes

On March 10, 2008, Plaintiff was seen by Sharon L. Jarmolowicz, P.A., at Concentra Medical Centers ("CMC") for pain in his right lower back (*id*. at 412-415). Jarmolowicz noted that Plaintiff was already being treated at CMC for a left shoulder injury sustained on February 8, 2007, for which he had undergone two surgeries (*id*.). During the visit, Plaintiff denied any

---

[2] Plaintiff has not criticized the ALJ's assessment of his restrictions based on his physical impairments on appeal. Accordingly, the court does not address those impairments and the resulting restrictions, other than to note the existence of those impairments and restrictions.

"abnormal Psycho/Social changes," and he was noted to be "alert, oriented x 3 & conversant," with a normal affect (*id*.).

Plaintiff was seen by his primary care physician, Kimat Khatak, M.D., on April 11, 2011 (*id*. at 506).  Dr. Khatak noted that Plaintiff was "very anxious and nervous" (*id*.).  "He went on the internet to read about COPD [chronic obstructive pulmonary disease] and then became so anxious and nervous that he could not take it anymore and that [sic] he was going to die that very day" (*id*.).  Dr. Khatak prescribed Ativan .5 mg every six hours as needed for anxiety (*id*.).

Plaintiff was seen again by Dr. Khatak on April 23, 2012 (*id*. at 505).  Plaintiff reported that he was very anxious and nervous and was taking Ativan off and on (*id*.).

On December 12, 2013, Plaintiff presented at the emergency room at Holyoke Medical Center with a sore throat (*id*. at 525-531).  Plaintiff was fully oriented with a normal mood and affect and intact memory (*id*. at 525).

## 2.  Consultative Psychological Evaluation

On November 15, 2011, Plaintiff was evaluated by Leon Hutt, Ph. D., a psychologist, at the request of the Social Security Administration (*id*. at 492-96).  Plaintiff's chief complaint was that he often woke at 4:00 a.m., and he would begin to sweat profusely, feel a sense of "gloom," and be unable to go back to sleep (*id*. at 493).  Plaintiff reported that he would lie in bed for a few hours and then it would "take[] everything" to get out of bed (*id*.).  Plaintiff also stated that he had difficulty falling asleep and was "always depressed" (*id*. at 494).  Plaintiff's focus was on what he perceived to be his "declining health status," relating to his emphysema, diabetes, and left shoulder condition (*id*.).  Plaintiff reported limited interpersonal contact mostly with his girlfriend of three and one-half years and his parents (*id*.).  Plaintiff denied past psychiatric treatment (*id*.).  Dr. Hutt conducted a mental status examination of Plaintiff (*id*. at 494-95).

6

According to Dr. Hutt, Plaintiff was "neatly dressed and neatly groomed, pleasant, polite, and cooperative," fully alert, and adequately oriented to time and place; his speech was generally clear, relevant, and coherent; and he exhibited no oddities of thinking or speech and no indications of psychosis (*id*. at 494). Dr. Hutt noted that Plaintiff impressed as "having excessive and somewhat unrealistic worry" (*id*. at 495). Dr. Hutt assessed Plaintiff's attentional capacity as "mildly impaired, likely secondary to his being anxious" (*id*. at 495). "Intellectually, he impressed as functioning broadly in the average range of adult intellectual functioning" (*id*.). Plaintiff exhibited no indications of impaired memory, his affect was appropriate, and he was "not anhedonic" (*id*.). Dr. Hutt's diagnostic impression was that Plaintiff suffered from generalized anxiety disorder with a Global Assessment of Functioning (GAF) score of 65.[3] Dr. Hutt stated that he saw Plaintiff as "competent to manage his own finances," but he had "some doubts" as to his ability to "psychologically tolerate the stressors associated with employment (*id*.).

3. Mental Health Treatment Records

Plaintiff began treatment with Luz Martin, M.D., a psychiatrist, on March 22, 2012 (*id*. at 500-01). Plaintiff's chief complaint was anxiety (*id*.). Plaintiff reported feeling depressed and having a fear of impending doom (*id*.). Dr. Martin assessed Plaintiff as exhibiting an appropriate affect, no flight of ideas, fair insight and judgment, and speech within normal limits (*id*.). He

---

[3] GAF scores are expressed in terms of degree of severity of symptoms or functional impairment, with scores of 41 to 50 representing "serious" severity, scores of 51 to 60 representing "moderate" severity, and scores of 61 to 70 representing "mild" severity *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders,* 32–34 (4th Ed. Text Revision 2000).

diagnosed Plaintiff with generalized anxiety disorder and major depressive disorder, assessed a

GAF score of 65, and prescribed medications (*id*.).

Plaintiff returned to Dr. Martin on August 20, 2012 (*id*. at 502, 523).  Plaintiff reported

experiencing increased anxiety relating to his unemployment (*id*.).  The other treatment notes

from this date are illegible.  Plaintiff saw Dr. Martin again on October 22, 2012, December 12,

2012, June 7, 2013, and August 6, 2013, but the treatment notes associated with those sessions

are illegible as well (*id*. at 522-23).

On January 4, 2013, on referral from Dr. Martin, Plaintiff met with Dr. Young K. Kim,

Ph. D., for a psychological examination "to determine his levels of cognitive, emotional, and

academic functioning, as well as coping skills" (*id*. at 549-552).  Plaintiff reported being

depressed since his shoulder injury, with symptoms of sadness, decreased pleasure, feeling

disappointed in himself, hopelessness, increased irritability and appetite, fatigue, inability to

relax, nervousness, being scared, and fear of the worst happening (*id*. at 549).  Plaintiff reported

owning a car and feeling capable of driving, managing finances, and shopping (*id*.).  Dr. Kim

administered a number of tests, including the Wechsler Adult Intelligence Scale – Fourth Edition

(WAIS-IV), Bender-Gestalt, Rorschach, Thematic Apperception Test (TAT), House-Tree-Person

Test, and Wide Range Achievement Test Revised Level 2 (WRAT-R2) (*id*.).  In administering

the tests, Dr. Kim observed that Plaintiff was appropriately and neatly dressed, that he was able

to easily establish rapport with Plaintiff, that Plaintiff was compliant with instructions and

appeared to do his best on the challenges, that Plaintiff listened carefully to directions and took

his time in carrying out the required tasks, and that Plaintiff was able to complete testing

protocols within the allotted time (*id*.).  The WAIS-IV results showed that Plaintiff was in the

high average range for verbal comprehension, the average range for perceptual reasoning,

working memory, and full scale IQ, and the low average range for processing speed (*id*. at 550).

Results of the WRAT-R2 showed that Plaintiff was functioning above a twelfth grade level in

reading and spelling and at a tenth grade level in arithmetic (*id*. at 551).  The Bender-Gestalt

results showed that his visual-motor development was intact (*id*).  The results of the Rorschach,

Thematic Apperception Test (TAT), and House-Tree-Person tests revealed no signs of serious

psychopathology, instead showing signs that Plaintiff "possesses very tenuous ego controls and

that he struggles with a great deal of inner tension, which propagates highly agitated responses"

(*id*.).  Plaintiff's "primary issues … appear[ed] to be his difficulty regulating his emotions and

dealing with his shoulder pain and unemployment" (*id*. at 552).  Dr. Kim diagnosed Plaintiff

with Major Depressive Disorder Recurrent Severe Without Psychotic Features and Anxiety

Disorder Due to Shoulder Injury and assessed him with a GAF of 55 (*id*.).  One of Dr. Kim's

recommendations for Plaintiff was that he engage in rehabilitative services for alternative

vocational training and job placement adaptive to his physical limitations" (*id*.).[4]

Plaintiff's next visit with Dr. Martin was on October 14, 2013 (*id*. at 520-21).  Plaintiff

reported stress related to living next door to his parents and helping them out, physical aches and

pains, health issues, and his inability to find a job (*id*.).  Dr. Martin conducted a mental status

examination and noted that Plaintiff's appearance, attitude, and motor activity were all normal

(*id*.).  His activities of daily living were fair (*id*.).  Dr. Martin observed Plaintiff to be

cooperative, pleasant, and able to sit still (*id*.).  Plaintiff was alert and oriented in all spheres

---

[4] Plaintiff also saw Dr. Kim for individual therapy three times between September 2012 and February 2013 (i.e. three times in six months) and five times between November 2013 and March 2014 (i.e. five times in five months after an eight month gap) (*id*. at 548).  In a note dated March 24, 2014, Dr. Kim noted that Plaintiff was undergoing therapy to treat symptoms of Major Depression and Anxiety Disorder Due to Shoulder Injury diagnoses, including symptoms of pain, anxiety, anger, uneasiness around people, and sadness."  Dr. Kim noted that Plaintiff was living with his girlfriend and was able to drive, manage his finances, and shop (*id*.).

(*id.*).  His mood was anxious (*id.*).  His speech, thought content, and thought form were all normal (*id.*).  His concentration, memory, and judgment were all fair (*id.*).  Dr. Martin assessed Plaintiff as having a GAF of 75 and added diagnoses for insomnia due to mental disorder and anxiety state, unspecified, to his existing mental health diagnoses of generalized anxiety disorder and major depressive disorder, single episode, moderate, and adjusted Plaintiff's medications (*id.*).

Plaintiff met again with Dr. Martin on December 23, 2013 (*id.* at 518-19).  Plaintiff indicated that he was still depressed and anxious (*id.*).  Dr. Martin conducted a mental status examination and noted that Plaintiff's appearance, attitude, and motor activity were all normal; his activities of daily living were good; he was cooperative, pleasant, and able to sit still; he was alert and oriented in all spheres; his speech was goal directed, with a normal rate and rhythm; he denied suicidal or homicidal ideation; his thought content consisted of no hallucination, delusion, or oddity; his thought form consisted of no looseness of association and no flight of ideas; his concentration was fair; his cognition was grossly intact; his insight and judgment were fair; and his mood and affect were depressed, dysphoric, and anxious (*id.*).  Dr. Martin again adjusted Plaintiff's medications (*id.*).

Plaintiff's final appointment with Dr. Martin was on March 19, 2014 (*id.* at 516-17).  Plaintiff indicated that he was more tired and "panicky" in the mornings, but he was sleeping well at night (*id.*).  Plaintiff reported that he was sleeping later in the mornings because he was feeling more anxious and depressed (*id.*).  He continued to provide care for his elderly parents and was having financial issues, which was leaving him feeling easily overwhelmed (*id.*).  Dr. Martin conducted a mental status examination and noted that Plaintiff's thought content and his

thought form were normal and his mood and affect were depressed, dysphoric, and anxious (*id*.). Plaintiff's diagnoses remained unchanged, but his medications were adjusted (*id*.).

> C.   State Agency Opinion Evidence

Dr. Lawrence Langer, a state agency psychologist, completed a Mental Residual Functional Capacity Assessment following a review of the evidence on December 19, 2011 (*id*. at 66-75).  Dr. Langer diagnosed Plaintiff as suffering from a severe Anxiety Disorder (*id*. at 69). He found that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration persistence, or pace, and no episodes of decompensation of extended duration (*id*. at 70).  In assessing Plaintiff's residual functional capacity, Dr. Langer opined that Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (*id*.).  Dr. Langer concluded that Plaintiff could sustain concentration, persistence, and pace for at least simple one and two step tasks (*id*.).

Dr. John Perlman, another state agency psychologist, reached similar conclusions in October 2012 (*id*. at 88-100).  He diagnosed Plaintiff with severe Anxiety Disorder and severe Affective Disorder (*id*. at 93).  In addition to the limitations noted by Dr. Langer, Dr. Perlman opined that Plaintiff is moderately limited in the ability to carry out detailed instructions (*id*.). Dr. Perlman concluded that Plaintiff could complete simple, routine tasks and sustain concentration for at least two hours (*id*.).[5]

---

[5] "The Social Security Administration's Program Operation Manual explains 'that the mental abilities needed for any job include the ability to understand, remember, and carry out simple instructions by, … maintaining concentration and attention for extended periods (the

D.   Plaintiff's Statements

Plaintiff completed a Function Report on April 11, 2012 (*id*. at 233-40).  Plaintiff

reported that he was living alone and handling his own personal care with some difficulty due to

his left shoulder injury, preparing his own meals, cleaning his house, doing his laundry, trying to

go out on a daily basis, driving, shopping for food and clothes, handling his finances, and visiting

his parents daily (*id*. at 234-37).  Plaintiff indicated that he got anxious when around too many

people and characterized himself as "very depressed" (*id*. at 238-39).  He reported that he did not

handle stress well (*id*. at 239).  In checkbox format, he marked that his conditions did not affect

his "memory," "understanding," or "following instructions," but did affect his "completing

tasks," "concentration," and "getting along with others" (*id*. at 238).  Nonetheless, he

characterized his ability to follow written instructions, follow spoken instructions, and handle

changes in routine as "very well," reported that he had no problem getting along with authority

figures, and advised that he was able to pay attention "[f]or a long time" and finished the things

he started (*id*.).

At the April 11, 2014 hearing, Plaintiff testified that he started to seek treatment for his

depression and anxiety three or four years earlier (*id*. at 46).  According to Plaintiff, the symptom

that caused him to seek treatment was that he would wake up in the mornings in a cold sweat,

panicking and not wanting to get out of bed (*id*.).  He stated that his anxiety could "be triggered

at a moment's notice," for example if he were to leave the hearing and find that his truck had a

flat tire, he would go into "panic mode" (*id*.).  Once triggered, the anxiety could last for

---

approximately 2-hour segments between arrival and first break, lunch, second break, and
departure.'"  *Dorman v. Astrue*, No. 12-40023-TSH, 2013 WL 4238315, at *13-14 (D. Mass.
May 21, 2013) (quoting *McGrath v. Astrue*, No. 10-cv-455-JL, 2012 WL 976026, at *6 (D.N.H.
Mar. 22, 2012) (slip op.)).  Thus, a two hour limit on concentration need not be incorporated into
an RFC.  *Id*.

anywhere from a few hours to a day (*id*. at 47).  Plaintiff testified that, in order to attempt to calm himself down, he would try to slow down his breathing and remove himself from the stressful situation (*id*.).  According to Plaintiff, medication had not helped alleviate his depression or anxiety (*id*. at 48).

Plaintiff testified that he lived with his girlfriend (*id*. at 49).  The two split household duties with his girlfriend doing the cooking and Plaintiff doing the dishes (*id*.).  Plaintiff also testified that he did laundry and occasionally accompanied his girlfriend to the grocery store (*id*.).  Plaintiff testified that he needed reminders to remember things (*id*.).  Plaintiff testified that he had "bad days" and "good days" (*id*. at 51).  "A bad day is just a day full of just being – feeling depressed, sorry for myself, you know, how I used to work and was able to, you know, take care of myself without having to have around someone else now for all my, you know – to pay for everything" (*id*.).  "A better day, like I'm visiting people, or my brother comes over, basically, you know, we start talking and you know, I just feel better about myself on those days" (*id*.).  The ALJ inquired whether Plaintiff thought earning a paycheck would help with his depression, and Plaintiff answered that he thought if he had a steady job, it might help (*id*.).  Plaintiff testified that he drove without difficulty, including driving to the hearing itself (*id*. at 46-47).  Plaintiff testified that he helped his elderly parents by taking their trash out once per week and picking up their basement (*id*. at 54).  The ALJ highlighted a notation from March 2011 that Plaintiff was looking for a job and inquired what type of work Plaintiff thought that he could do (*id*. at 52).  Plaintiff responded that he did not think anyone would hire him presently because of his breathing (*id*.).  He added "sometimes [I] think I could find an electrical job where

I could sit on my – sit down and maybe like wire outlets all day long.  But I know that's not, you

know – they would never hire someone for that" (*id*. at 53).

E.   Vocational Expert's Testimony

The vocational expert (VE) testified that a hypothetical individual of Plaintiff's age,

educational background, and work history, with an RFC for light work, with the additional

limitations of no more than occasional bending and twisting, no lifting or carrying of more than

five pounds with the left non-dominant upper extremity when used individually, and no reaching

upward above shoulder level, in an indoor environment with no concentrated exposure to dust,

fumes, strong odors, temperature or humidity extremes, and no exposure to unprotected heights

or dangerous machinery, could perform jobs as a hand sewer (DOT # 788.684-054), a cashier

(DOT #211.462-010, and an usher/ticket taker (DOT #344.677-014) (*id*. at 60-61).

V.   The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis

required by the regulations.  At the first step, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since his alleged onset date (*id*. at 15).  At the second step, the ALJ

found that Plaintiff had severe impairments consisting of: history of labral tear and rotator cuff

injury to the left shoulder, with some residual symptoms status post two surgical interventions;

history of obstructive airway disorder; and more recent onset of ulnar neuropathy affecting the

ring and small fingers of the left, non-dominant hand (*id*.).  The ALJ found that Plaintiff's

depression and anxiety were not severe (*id*.).  At step three, the ALJ found that Plaintiff did not

have an impairment or combination of impairments that met or medically equaled the severity of

one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id*. at 17).  Before

proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to "perform light

work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)[6] except he can perform no more than

occasional bending and twisting.  His left, non-dominant upper extremity is limited to lifting and

carrying no more than 5 pounds – to the extent it is used individually, and to no upward reaching

beyond a point at which his left arm would be parallel to the ground.  He is limited to work that

is done indoors, with no concentrated exposure to dust, fumes, strong odors, temperature or

humidity extremes.  Due to medication side-effects, he should avoid exposure to unprotected

heights and dangerous machinery" (*id*. at 17) (footnotes omitted).  At step four, the ALJ

determined that Plaintiff was unable to perform any past relevant work (*id*. at 20-21).  At step

five, relying on the testimony of an independent vocational expert, the ALJ determined that

Plaintiff could perform jobs found in significant numbers in the national economy taking into

account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not

disabled (*id*. at 21-22).

VI.   Analysis

A.   The ALJ Did Not Err

Plaintiff's sole argument on appeal is that the ALJ erred by not finding his depression and

anxiety to be severe impairments.  As set forth above, step two of the sequential evaluation

process requires the Commissioner to determine whether a claimant possesses a severe

impairment.  *See* 20 C.F.R. § 416.920(a)(4)(ii); 20 C.F.R. § 404.1520(a)(4)(ii).  It is not enough

for a plaintiff to be diagnosed with an impairment.  *Grady v. Astrue*, 894 F. Supp. 2d 131, 141

(D. Mass. 2012).  "A mere diagnosis of a condition 'says nothing about the severity of the

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in
this category when it requires a good deal of walking and standing, or when it involves sitting
most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567
(b); 20 C.F.R. § 416.967(b).

condition.'" *White v. Astrue*, No. 10-10021-PBS, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011) (quoting *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)).  For an impairment to be "severe," a plaintiff must provide evidence that it significantly limits his or her physical or mental ability to perform basic work activities.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).  To evaluate the severity of a mental impairment, an ALJ must follow the special technique set forth in the regulations.  20 C.F.R. §§ 404.1520a, 416.920a.  Once a medically determinable impairment has been found, an ALJ must evaluate the claimant in four areas of mental functioning, including: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  *Id*. at §§ 404.1520a(c)(3), 416.920a(c)(3); *see also Figueroa-Rodriquez v. Sec'y of Health & Human Servs.*, 845 F.2d 370, 372 (1st Cir. 1988) (describing the special technique); *Guyton v. Apfel*, 20 F. Supp. 2d 156, 165 (D. Mass. 1998) (same).  The first three functional areas are ranked on a five-point scale consisting of none, mild, moderate, marked, and extreme, and the fourth functional area utilizes a four-point scale consisting of none, one or two, three, and four or more.  20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).  If the claimant has no or mild limitations in the first three functional areas and no episodes of decompensation, an ALJ will generally conclude that the claimant's mental impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities …."  *Id*. at §§ 404.1520a(d)(1), 416.920a(d)(1).

Here, the ALJ determined that Plaintiff's anxiety and depression imposed no significant work-related limitations and, thus, were not severe impairments (A.R. at 15).  In reaching this conclusion, the ALJ followed the special technique required by the regulations and found that Plaintiff had no limitation in the activities of daily living, mild limitation in maintaining social

functioning, mild limitation in maintaining concentration, persistence, and pace, and no episodes of decompensation (*id*. at 16-17).  As the ALJ noted, his ratings conflicted with those of the state agency psychologists with respect to two of the functional areas.  Specifically, the state agency psychologists assessed Plaintiff as having mild restriction of the activities of daily living and moderate difficulties in maintaining concentration, persistence, and pace (*id*. at 70, 94).  Despite this discrepancy, there is substantial evidence in the record to support the ALJ's findings.

According to Plaintiff's own testimony, as observed by the ALJ, Plaintiff conducted a number of daily activities without difficulty attributable to his anxiety or depression, including doing the dishes and laundry, driving, and accompanying his girlfriend to the grocery store on occasion (*id*. at 16, 46-47, 49).[7]  Plaintiff also testified that he helped his elderly parents by taking out their trash once a week and cleaning their basement (*id*. at 46-47, 54).  Plaintiff's testimony was consistent, again as observed by the ALJ, with the notes from Dr. Martin, Plaintiff's treating psychologist, describing Plaintiff's activities of daily living as "fair" and "good" in October and December 2013, respectively (*id*. at 16, 518-19, 520-21).  It was also consistent with Plaintiff's report to Dr. Kim in January 2013 that he owned his own car and drove it, managed his own finances, and did his own shopping, as well as Plaintiff's statements in the Function Report he completed in April 2012 that he handled his own personal care, prepared his own meals, cleaned his house, did his laundry, did his shopping, and handled his finances (*id*. at 234-37, 549).  Thus, there is substantial evidence in the record that, as found by the ALJ, Plaintiff had no restriction of his activities of daily living.

---

[7] Indeed, the ALJ found that Plaintiff "is able to do all activities of daily living other than cooking, which his girlfriend does …" (*id*. at 16).  Plaintiff did testify that his girlfriend cooked for the two of them, but he attributed this to her liking to do the cooking rather than an inability on his part to cook (*id*.).

With respect to concentration, persistence, and pace, Plaintiff reported in checkbox form

on the Function Report that he had some concentration problems (*id*. at 238).  However, he

stated in the same document that he could pay attention "for a long time," and that he completed

the things he started (*id*.).  Moreover, as the ALJ noted, Dr. Hutt reported in November 2011 that

Plaintiff's attentional capacity was only mildly impaired, that he was functioning broadly in the

average range of adult intellectual functioning, and that he exhibited no indications of impaired

memory (*id*. at 17, 495).  Dr. Hutt's statements are consistent with Dr. Kim's observations in

conjunction with his January 2013 psychological evaluation that Plaintiff complied with

instructions and completed testing protocols within the allotted time, as well as the results of the

testing that showed Plaintiff was in the high average range for verbal comprehension, the

average range for perceptual reasoning, working memory, and full scale IQ, and the low average

range for processing speed (*id*. at 549-550).  Also consistent are Dr. Martin's notes that

Plaintiff's concentration, memory and judgment were all fair in October and December 2013 (*id*.

at 518-19, 520-21).[8]  Thus, there is substantial evidence in the record that Plaintiff had no more

than mild limitations in maintaining concentration, persistence, and pace.  While the record

arguably could support a finding of greater limitation, resolving conflicts in and drawing

conclusions from the evidence are the province of the ALJ and not the court.  *Irlanda Ortiz*, 955

F.2d at 769.  The ALJ's findings must be upheld as long as they are supported by substantial

evidence and that standard is met here.[9]  *Ward*, 211 F.3d at 655 (citing *Nguyen*, 172 F.3d at 35).

---

[8] Additionally, as the ALJ noted, Dr. Hutt and Dr. Martin assigned Plaintiff GAF scores from 65 to 75, representing "no more than mild functional impairment (*id*. at 17, 495, 501, 520).
[9] The court also rejects Plaintiff's argument that the ALJ impermissibly ignored medical evidence and substituted his own view for uncontroverted medical opinion as prohibited by *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994).  In *Rose*, the ALJ found it "possible" that the claimant had Chronic Fatigue Syndrome (CFS), while the uncontroverted medical opinion established that

## B.  Even if the ALJ Erred, the Error Would Be Harmless

As discussed, the ALJ's ratings of Plaintiff's functional limitations diverged from the ratings assessed by the state agency psychologists only with respect to the functional areas of activities of daily living and maintaining concentration persistence and pace.  Where the ALJ assessed no limitation in the activities of daily living, the state agency psychologists assessed mild limitation.  Where the ALJ assessed mild limitation in maintaining concentration, persistence, and pace, the state agency psychologists assessed moderate limitation.  Assuming for the sake of argument that the ALJ erred in not finding that Plaintiff was mildly limited in activities of daily living, the ALJ's conclusion that Plaintiff's mental impairments were not severe would remain sound.  20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) (providing that if the claimant has no or mild limitations in the first three functional areas and no episodes of decompensation, an ALJ will generally conclude that the claimant's mental impairment is not severe).  Assuming the ALJ erred in not finding that Plaintiff was moderately restricted in concentration, persistence, and pace, which would generally merit a finding of severe, the error would be harmless.  While the ALJ did not limit Plaintiff to simple tasks in his RFC, the positions the VE identified – hand sewer, small parts assembler, and usher/ticket taker – involve simple tasks (*id*. at 60-61).  The Dictionary of Occupational Titles (DOT) provides that all three have a reasoning level of two, corresponding to "[a]pply[ing] commonsense understanding to carry out detailed but uninvolved written or oral instructions," and "[d]eal[ing] with problems involving a few concrete variables in or from standardized situations."[10]  Courts regularly have

_____

the claimant had CFS.  *Id*.  Here, the ALJ did not reject Plaintiff's diagnoses of anxiety and depression; he simply found that they were not severe.

[10] The hand sewer job corresponds to DOT # 788.684-154, available at 1991 WL 681147; the small parts assembler job corresponds to DOT # 706.684-022, available at 1991 WL 679050; the usher/ticket taker job corresponds to DOT # 344.677-014, available at 1991 WL 672865.

found that DOT reasoning levels two and three are consistent with an RFC limitation to simple and unskilled tasks.  *See Augur v. Astrue*, 792 F. Supp. 2d 92, 96-7 (D. Mass. 2011); *Lafrennie v. Astrue*, No. 09-40143-FDS, 2011 WL 1103278, at *7-8 (D. Mass. Mar. 23, 2011).   The VE testified that those jobs exist in significant numbers locally and nationally, satisfying the Commissioner's burden at step five.  *See, e.g., Aho v. Comm'r of Social Security Admin.*, No. 10-40052-FDS, 2011 WL 3511518, at *8 (D. Mass. Aug. 10, 2011).   Thus, even if the ALJ should have imposed a mental RFC limitation to simple and unskilled work, Plaintiff would still be found not disabled at step five, and there is no basis for remand.  *Ward v. Comm'r of Social Security*, 211 F.3d 652, 656 (1st Cir. 2000) (citing *Dantran, Inc. v. United States Dep't of Labor*, 171 F.3d 58, 73 (1st Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("[A] remand is not essential if it will amount to no more than an empty exercise.").

VII.   Conclusion

For the reasons stated, Plaintiff's motion for judgment on the pleadings (Dkt. No. 13) IS DENIED, and the Commissioner's motion for an order affirming the decision (Dkt. No. 17) IS GRANTED.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

20